2011 Ark. App. 477

**Troy COBREN, Appellant**

v.

**Laura ANDERSON, Appellee.**

**No. CA 10–776.**

Court of Appeals of Arkansas.

June 29, 2011.

Ernest Wayne Witt, Ozark, for appellant.

DOUG MARTIN, Judge.

Troy Cobren appeals from an order of the Yell County Circuit Court awarding judgment to appellee Laura Anderson and imposing an equitable lien on Cobren's interest in real property that the parties held as tenants in common. Cobren argues that (1) the trial court erred in finding that the parties had entered into a contract implied in fact while awarding Anderson remedies based on a contract implied in law; (2) the trial court erred in imposing an equitable lien on Cobren's property; (3) the trial court gave Anderson a double, or triple, recovery; and (4) Anderson did not overcome the presumption that some of the money she gave Cobren was a gift. We affirm.

The parties became romantically involved around 1998 and planned to get married. In 2002, Cobren won a million-dollar lottery in Illinois. In 2003, Cobren purchased a house, farm equipment, and acreage in Yell County, Arkansas. Soon thereafter, Cobren moved to Yell County and began a landscaping business. In April 2004, Anderson joined Cobren in Yell County. That same month, the Yell County Prosecuting Attorney charged Cobren with manufacturing marijuana, possession of drug paraphernalia, and simultaneous possession of drugs and firearms.

Due to his legal problems, Cobren needed money for attorney's fees, fines, and court costs. Because of a bad credit history, Cobren could not borrow the money on his own. Anderson, on the other hand, had a good credit history. Neither party disputes that, in order to pay Cobren's expenses, the parties orally agreed that Cobren would give Anderson a one-half interest in the house and acreage in exchange for Anderson taking out a loan secured by a mortgage on her interest in the property. As per the parties' agreement, on May 18, 2004, Cobren gave Anderson a warranty deed to a one-half interest in the property. In July 2004, Anderson took out a loan—secured by a mortgage on her interest in the real property—for $70,009.58.

In December 2004, Anderson took out a second loan secured by a mortgage for $100,218.50. With the money from the second loan, Anderson paid off the first loan and borrowed additional funds. Of the second loan, $15,336.36 was disbursed to Anderson, and three disbursements totaling $8,731 paid off three of Anderson's credit cards.

In April 2005, Anderson took out a third loan secured by a mortgage on the real property. With the money from the third loan, Anderson paid off the second loan and borrowed additional funds, raising

her total debt to $160,800. Of the third loan, $29,931.60 was disbursed to Anderson, and disbursements totaling $28,156 paid off two of Anderson's car loans.

According to Anderson, she left the parties' home in April 2006 after Cobren, through threats, lies, and intimidation, made it impossible for her to stay. Anderson, however, continued to pay the mortgage.

In December 2007, Anderson filed this action against Cobren, alleging that Cobren had recently listed the property for sale and had threatened to forge her signature. Anderson requested an injunction barring the sale until the court determined her interest in the property.

Anderson subsequently amended her complaint to allege unjust enrichment and to request that the court order that the property be sold and impose an equitable lien on Cobren's interest in the property. Anderson also asked for the fair rental value of the property for the period of time Cobren prevented her from occupying it, for the return of her personal property, and for possession of some firearms she purchased at Cobren's civil forfeiture proceeding.

In response, Cobren denied inducing Anderson to take out multiple mortgages to pay his expenses. Cobren further alleged that most of the loan proceeds were applied to Anderson's personal debts.

The case went to trial on November 20, 2009. Anderson testified that, to prevent the house from being foreclosed upon, Cobren asked her to borrow money to pay his legal fees and medical bills. Anderson stated that the parties agreed Cobren would put the interest to half of the property in Anderson's name, and Cobren would make the payments on the mortgage on the property taken out by Anderson.

Anderson testified that the proceeds from the first loan sufficed for a short time but that Cobren's business did not generate enough money to pay the bills. Consequently, the parties accumulated much debt—most of which, according to Anderson, was Cobren's.

Anderson testified that she took out the second loan in December 2004 for $100,000 and deposited over $8,600 from the proceeds of the loan into Cobren's account. Anderson said that, by April 2005, Cobren needed more money, and Anderson thus took out a third loan in the amount of $160,000. Anderson stated that she deposited a total of $64,000 from the three loans into Cobren's account. She further testified that she made all of the mortgage payments except four.

Anderson testified that, on June 22, 2009, the house sold for $141,908.33. A tractor on which Anderson had made payments since 2004 was sold along with the real property. The proceeds from the sale of the real property were deposited into the registry of the court.

Anderson also testified about a list of payments for which she sought reimbursement. Anderson explained that her parents took out a second mortgage on their home and made some of the parties' mortgage payments, which she promised to repay, and that she owed her parents $67,000 and approximately $4,800 in interest. Anderson described payments she made for Cobren's child-support obligations, his medical bills and legal fees, a loan she made to his landscaping business, his business insurance, his separate acreage, a hitch for his truck, and his debt to the IRS, as well as checks made payable directly to Cobren. Anderson testified that Cobren promised to repay her as soon as he "got back on his feet."

During cross-examination, Anderson stated that only one mortgage payment was made from loan proceeds and that none of the mortgage payments for which she sought reimbursement came from loan proceeds. Anderson testified that she made the majority of the payments after she left Cobren to prevent foreclosure of the real property of which she was a half owner. Anderson stated that, to obtain the mortgage, Cobren had to place the property in both of the parties' names and Anderson had to pay off her own debts as well. Anderson emphasized, however, that she was not asking the court to award her those amounts that she applied to her personal debts. According to Anderson, when she moved out, she had been supporting Cobren for nearly a year, and nothing was left of the loan proceeds. Anderson testified that she also had depleted her 401K.

Anderson said that, giving Cobren the benefit of the doubt, she had removed from her list any payments that might have been paid from the loan proceeds.[1] Anderson testified that she made twenty-seven mortgage and thirty-eight tractor payments after the parties separated. Again, Anderson emphasized that she was not asking to be reimbursed for payments she had made from loan proceeds, but only for the money that she had paid for Cobren's benefit.

Anderson introduced Cobren's emails that she claimed reflected his agreement to repay her. An email from Cobren dated August 31, 2006, stated, "[T]he money I borrowed was a loan from my house. I think I was entitled to do with it what I wanted." Another email dated September 6, 2006, stated, "Good luck Laura and when I sell the house I will give you your money." In an email dated September 22, 2006, Cobren wrote, "I will have to figure a way to pay you and the mortgage [sic] of

[sic] and that's what I will do." Finally, in an email dated October 6, 2006, Cobren stated, "I guess I am just going to have to sell the place and give youre [sic] money."

Lindsey Richardson, Anderson's daughter, testified that she had known Cobren since she was young and that Cobren had asked her mother for money for things such as cigarettes and gas when they lived in Illinois and Arkansas. Lindsey also testified that Cobren had promised to repay her mother the money he had borrowed from her.

Mary Vancura, Anderson's mother, also testified that she had heard Cobren tell Anderson that he would repay the money he had borrowed from her.

Bruce Garrett, a CPA, testified that the reductions made by Anderson on her list of payments were appropriate. Garrett clarified that the amounts requested had been reduced by the amount paid on Anderson's debts.

Cobren testified that, after he had unsuccessfully attempted to mortgage the house on his own, he and Anderson agreed that she would obtain the loan in her name if Cobren put her name on the deed. Cobren contended that he was not aware of more than one mortgage and disputed Anderson's testimony about the disposition of some of the proceeds and payments she claimed were made using her funds. Overall, however, Cobren demonstrated very little knowledge of how the money was spent or any aspect of the financial transactions. Cobren said that the parties had not distinguished between his and her money, and he denied promising to repay Anderson.

In rebuttal, Anderson testified that she would not have loaned Cobren the money if he had not promised to repay her. She

---

1. The amounts are set out in the trial court's letter opinion, as quoted below.

further stated that her share of the proceeds from the sale of the house would not pay off all of the debts she had incurred in relying on Cobren's promise to repay her.

In his post-trial brief, Cobren argued that the parties had simply made gifts to each other and denied any agreement to create a lien on his share of the property. In response, Anderson denied that the monetary transfers were gifts.

The trial court made the following findings in its letter opinion:

It is undisputed that [Anderson] is entitled to one half of the monies in the Registry of the Court. The only issue for this Court to determine is what monies [Anderson] is entitled to from [Cobren's] portion of the monies held in the Registry of the Court.

. . . .

The evidence is undisputed ... the mortgage payments that [Anderson] made on the property total $42,004.98 and [Anderson] is entitled to this sum. It is also undisputed that [Anderson] made various other payments for the benefit of [Cobren] and I find that he agreed to repay these monies. These would be ... the IRS payments, $750.00; land payments, $800.00; loan, $400.00; loan to landscape company, $1,000.00; his insurance, $582.21; his medical, $246.10; his legal bills, $1,960.00; his child support payments, $1,200.00; tractor payments, $9,714.49; and payments on a Jefferson trailer in the amount of $2,580.00. Also, the testimony was undisputed that [Anderson] had taken a loan from her parents regarding the above monies that had been advanced for the benefit of [Cobren] and the interest she had to pay on this loan was $4,463.03 .... In the instant case it is clear that [Anderson] loaned considerable amounts of money to [Cobren] in order to keep him going in his business,

when he had trouble with the law, and for various help with his legal and personal problems, including payment of some of his medical bills. There's no other adequate remedy for [Anderson] and unjust enrichment would accrue to [Cobren] if [he should receive the benefit of the above payments, especially when [Anderson] and [Cobren] had a lengthy and personal relationship. I am finding that [Anderson] has an equitable lien, to avoid unjust enrichment to [Cobren], ... from [Cobren's] portion of the monies held in the Registry of the Court.

On March 22, 2010, the trial court entered a judgment awarding Anderson $70,954.16, less $2,221.25 for distributions already made, for a net of $68,732.92 out of the proceeds from the sale of the real property. The judgment also awarded Anderson $65,200.81 for money loaned and secured by an equitable lien, plus attorney's fees and costs. The court did not award Anderson the value of the personal property she claimed or the fair rental value of the real property. In the judgment, the trial court explained its decision as follows:

The Court found credible and undisputed evidence that [Anderson] had loaned to [Cobren] the sum of $65,200.81 and that [Cobren] had agreed to repay her said sum; further, that said sum was lawfully and appropriately secured by an equitable lien in [Anderson's] favor on [Cobren's] presumptive share of the sales proceeds in the registry of the Court. The Court also opined that[,] even without the proof of "loans made in exchange for promises to repay," the same result could and should need to be reached through the application of the doctrine of unjust enrichment.

In his first point on appeal, Cobren argues that the trial court erred in finding

that the parties entered into a contract implied in fact and giving Anderson the benefit of that agreement, while also awarding damages based on a contract implied in law or a theory of unjust enrichment. Because Cobren has mischaracterized the trial court's findings, we disagree.

 In the judgment, the court did not find that the parties entered into an implied contract;[2] rather, the court found that the parties had an express agreement whereby Anderson ¦₉loaned Cobren money, and Cobren agreed to repay her. *See K.C. Props. of Nw. Ark., Inc. v. Lowell Inv. Partners, LLC,* 373 Ark. 14, 280 S.W.3d 1 (2008) (discussing express and implied-in-fact contracts). It is generally held that, where there is an express contract, the law will not imply a quasi- or constructive contract (such as unjust enrichment). *Coleman's Serv. Ctr., Inc. v. Fed. Deposit Ins. Corp.,* 55 Ark.App. 275, 935 S.W.2d 289 (1996). The court discussed unjust enrichment as an alternative basis for its ruling, explaining in the judgment that, even without the proof of loans made in exchange for promises to repay, the court would have reached the same result by applying the doctrine of unjust enrichment.[3] We affirm on this point.

 In his second point, Cobren argues that the trial court erred in giving Anderson an equitable lien on his real property without finding that the parties had an agreement to give her such a lien or that Cobren had obtained the money through trickery or fraud. Again, we disagree.

 Anderson submitted sufficient evidence that the parties had an express agreement through the emails Cobren sent her. In any event, an equitable lien, which is a right to have a demand satisfied from a particular fund or specific property, *C.A.R. Transp. Brokerage Co.* ¦₁₀*v. Seay,* 369 Ark. 354, 255 S.W.3d 445 (2007), can be imposed in more situations than those listed by Cobren. The lien may arise by implication out of general considerations of right and justice, where, as applied to the relations of the parties and the circumstances of their dealings, there is some obligation or duty to be enforced. *Id.* at 361, 255 S.W.3d at 451. The law's tendency is to limit rather than expand all constructive liens; in the absence of fraud, there must be no adequate remedy at law and a basis for equitable relief. *Id.,* 255 S.W.3d at 451. The equitable basis for this remedy was solidly established by Cobren's lengthy history of using Anderson financially, while promising to repay her, and consistently failing to follow through on those promises. In its letter opinion, the trial court found that there was no adequate remedy at law, and we cannot say that it erred in doing so.

 In his third point, Cobren asserts that the trial court erroneously gave Anderson a double, or triple, recovery by making an inequitable distribution. He contends that the court should not have

---

2. An implied-in-fact contract is one that is inferred from the acts of the parties or from circumstances demonstrating their intention. *Pettus v. McDonald,* 343 Ark. 507, 36 S.W.3d 745 (2001). In contrast, an implied-in-law contract is not a contract at all, but an obligation imposed by law to do justice even though no promise was ever made or intended. *Id.*

3. Even if the court had stated that it was making an unjust-enrichment award, which is generally based upon the value of the benefit conferred upon the party unjustly enriched, *City of Damascus v. Bivens,* 291 Ark. 600, 726 S.W.2d 677 (1987), such an award may, in certain circumstances, be based upon the payment due under the contract. *Roberts Contracting Co. v. Valentine–Wooten Rd. Pub. Facility Bd.,* 2009 Ark. App. 437, 320 S.W.3d 1 (2009).

awarded Anderson the full amount of the money she loaned him plus the full value of her interest in the house. He states:

> Allowing [Anderson] to recover under her theory of express contract for the value of equity of the house, with no offset for her portion of the debt received through the mortgage, under unjust enrichment for the value of the purported loans made to [Cobren] and for the payments on the underlying loan itself, affords [Anderson] a double or triple recovery, which is unconscionable.

In attempting to discern the nature of the parties' agreement, the trial court correctly considered all of the evidence and properly focused on the intent of the parties in the light of all attendant circumstances. *Machen v. Machen,* 2011 Ark. App. 47, at 5, 380 S.W.3d 497, 501–02. Conclusions concerning the true intent of the parties primarily involve issues of fact, and the trial court's decision on such issues will not be reversed unless the findings are clearly erroneous. *Id.,* 380 S.W.3d at 504. Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. *Id.,* 380 S.W.3d at 504. Whether Cobren agreed to repay Anderson the entire amount that she loaned him, without taking credit for the value of her interest in the house, was a question of fact for the trial court to determine. Anderson's testimony and Cobren's emails, discussed above, supported the trial court's understanding of the parties' agreement. We cannot say that the trial court's decision was clearly erroneous, and we affirm on this issue as well.

In his fourth point, Cobren argues that the trial court erred in finding that Anderson overcame the presumption that she made a gift to him of some of the money. The trial court, however, did not make such a finding. We will not address

arguments if they were not ruled on by the trial court. *Machen,* 2011 Ark. App. 47, at 6, 380 S.W.3d at 502.

Affirmed.

WYNNE and HOOFMAN, JJ., agree.